Case No. 16-5065 James J. Kaufman, appellant v. Elaine C. Duke, Acting Secretary, United States Department of Homeland Security et al. Mr. Bora for the amicus curiae, Mr. Vila for the affilis. Mr. Bora for the amicus curiae, Mr. Vila for the affilis. Mr. Bora for the amicus curiae, Mr. Vila for the affilis. May it please the Court, my name is Amit Bora and I'm here on behalf of the amicus counsel appointed to support the appellant, Mr. Kaufman. At issue here is whether a U.S. CIS field office violated the APA when it held that Mr. Kaufman lacked the intention to relinquish his U.S. nationality simply because he lacked a present physical ability to leave this country and enter another. And the statutory structure is key here. I'm curious about that. Your brief talks about the APA and you just said the question is whether it violated the APA. But why isn't this just a straightforward question of statutory interpretation? I mean, as you say in your brief, the statute says, commits one of the following acts with the intention of relinquishing U.S. nationality, intention of relinquishing U.S. nationality. And the agency has, according to you, has gone beyond that and imposed a per se rule, right? So why isn't, why aren't we just asking whether that's a proper interpretation of statute? We followed the analytical framework that was outlined in Fox v. Clinton and Well, that doesn't really answer my question. I mean, I just asked you, I'm looking at the statute. It says, the question is, the statute says intent. And the agency says, the agency says that there's more than just subjective intent, right? But in addition, they have to show a credible plan or ability to leave, right? Yes. So why isn't that a question of statutory interpretation? Yes, this is a question of statutory interpretation. The agency has entirely misinterpreted the statute. So it's not an APA case. It's a Chevron case. It would be both, Your Honor, we believe. Okay. Okay, well, go ahead with your argument. Well, under 1481A, Congress is See, you're starting with the statute, just like I am. Go ahead. Under 1481A, Congress has enumerated seven expatriative acts. Right. And 1483 says that if a U.S. national performs any of those expatriative acts within the United States, then the U.S. national will lose his or her nationality only after leaving the United States and entering another country. But 1483 expressly exempts A-6 from that requirement. A-6 is a domestic renunciation provision under which Mr. Kaufman is proceeding. So 1483, right in conjunction with A-6, amounts to this rule. If you're a U.S. national and you wish to renounce and thereby relinquish your U.S. nationality, you may do so without ever leaving the United States and without ever stepping foot on foreign soil. So what the letter has done is grafted a condition onto A-6 that directly contravenes the structure that Congress adopted. The letter is saying that, no, if you're a U.S. national, you may not leave this country and you may not renounce your nationality and thereby relinquish your nationality unless you leave this country and demonstrate a present physical ability for doing so. So the letter has imposed a condition onto A-6 that is precisely what Congress exempted A-6 from. So in that sense, the letter is simply at loggerheads with the statutory structure. And the statutory structure— I thought the purpose of the letter was to interpret this phrase, the intention of relinquishing U.S. nationality, and concluding that one does not show an intention of relinquishing U.S. nationality if one exercises a right of citizenship such as residency. Did I misunderstand that? I thought that's how we should frame the issue. I think the letter went beyond that and said that one may formulate an intent to relinquish U.S. nationality only if one also demonstrates a present physical ability to depart this country and enter another country. And that's where the letter went too far. We accept the position that to intend to do something, one must fully understand the consequences of that act. So to intend to relinquish U.S. nationality, one must fully understand that one is relinquishing their right to U.S. residency. But Mr. Coffman has repeatedly and unequivocally sworn that he understands he will lose his right to U.S. residency. He understands that he will become stateless. But to him, the benefit of losing— What happens then? Right. What happens then? The USCIS has warned him what happens then. And what happens then is that he loses a bundle of rights and privileges associated with being a U.S. national. He will have difficulty maintaining a job. He will lose his right to vote. He will lose his right to hold elective office. Will he be detained? He may be detained. It's unclear under the statutes. Why would he be detained? Because he would have no lawful immigration or residency status in the United States. I see. I see. But he, in his mind, values losing his nationality. He places a tremendous amount of value on it. And the benefit of losing his U.S. nationality outweighs those risks and those harms. And the lesson— Well, if he's—if the consequence of being stateless is that he's—and they find him he's going to be excluded, then he will end up outside the country. Why would the agency require that he have a plan to leave the country if the government is going to send him out of the country anyway? The government has indicated that it won't send him out of the country. The government has indicated that he has no means of leaving the country. There's no place to send him to. No, I thought you said—I thought you said in response to Judge Griffith that he could be deported. Didn't you? He—and then I said, why? And you said, well, because he's here illegally. And that made sense to me. My question was whether he could be detained. Oh. Not deported. Detained. Yes. Sorry. Yes, Your Honor, he could be detained. Detained. In fact, he wouldn't be able to be deported, right? There's no place to send him? There's no country that has been willing to take him. He's made efforts to leave, but his efforts have been snubbed. Every country has turned him down, which is why he's pressing his A6 claim to domestically renounce his U.S. nationality without ever having to leave and without ever having to gain access to another country. And the lesson from this Court's decision in Schnitzler is that if a U.S. national wishes to press his A6 claim, it's not for us to scoff at that cost-benefit analysis. It's an injury to be forced to retain your U.S. nationality against your will arbitrarily in this way. How does your client's or appellant's request comport with the purpose of the statute or this particular provision of the statute? My research indicates that the purpose of this is from an unfortunate period of time during World War II when this provision was promulgated or passed by Congress to make it easier to essentially allow people in Japanese internment camps to renounce their citizenship so that they could be deported and sent to Japan. You're right, Your Honor. But the legislative history contains two strands of congressional purposes. First, many members of Congress wanted to create an expatriate pathway whereby Japanese Americans could easily domestically renounce and thereby relinquish their U.S. nationality. But you're right, Your Honor, the motives of these members of Congress were sinister. This was a dark time in our nation's history. These members of Congress wanted these Japanese Americans to relinquish their U.S. nationalities so that the U.S. government could then mistreat them and even detain them. But there's another strand of legislative history whereby certain members of Congress wanted to write a general statute. And these members of Congress wanted to prioritize efficiency and ease of administration. That's the motivation reflected in the statutory text because the statutory text mentions nothing about Japanese Americans. So through A6 in 1483, Congress appears now to be saying, during times of war when emotions are running high, if you don't appreciate your U.S. citizenship and you want to discard it, you may do so. In fact, we, the government, will accommodate you, will provide you an efficient and easy way to do so, will let you relinquish your nationality by renouncing it. And what does it mean to renounce? To renounce something means to formally and simply state, I hereby no longer want this. So the USCIS has overcomplicated what was intended to be a simple expansion of that. If we weren't in a time of war, what would your client be allowed to do? What options does he have? Nothing. The statute, if we weren't at a time of war. He'd have to go abroad, right? Yes, Your Honor. The state of war prong has to be triggered on. Yeah. And the state of war prong has been triggered on for the purposes of this application. Uh-huh. Uh-huh. If the state of war prong were triggered off, then this pathway would be closed. Gotcha. Gotcha. And remind me what the district court did with that issue, the state of war issue. Right. And, Your Honor, in 2010, the district court interpreted the state of war prong in this way. The relevant time period for determining whether the U.S. is at war is when the renunciant is filing her application. And the district court held that because the U.S. was at war with Iraq in 2004, Mr. Kaufman's, and because Mr. Kaufman had filed his application in 2004, the state of war prong had been triggered on for the purposes of Mr. Kaufman's application. And the district court further reasoned that once the state of war prong has been triggered on, it stays on for the duration of the application's process. I see. And, as you know, in the USCIS's letter, they state that the district court's interpretation of the state of war prong is correct, and that appears on page 7 of their letter. Uh-huh. Uh-huh. Okay. Anything else? No. Okay. Thank you. Thank you. Good morning. May it please the Court. Yamila Savila on behalf of the appellees of the Department of Homeland Security and United States Citizenship and Immigration Services. The Court should affirm the district court's decision where plaintiff petitioner, appellate, has failed to establish the statutory requirements for domestic renunciation of citizenship. Well, isn't the question in this case, what is the statutory requirement as interpreted by the agency? Yes, Your Honor. This is a question of statutory interpretation. Right. And our position is that the decision... So the question is whether or not... He admits that he has not, he does not have a, at least I think he does, that he has a plan to leave the country. The question is whether that's a, whether the department has acted lawfully by imposing that requirement, right? Am I right about that? Your Honor, he challenges whether or not he can relinquish citizenship and yet exercise a privilege and right of citizenship. And what's the privilege or right of citizenship that you think he's exercising? He wishes to continue to exercise the seminal privilege of residing in the United States. No, I don't think he's phrasing it that way. He wants to stay in the United States. That's physical presence. Physical presence isn't the same as right of residency. No, Your Honor. A visa holder who overstays her stay is physically present in the United States, but she's not exercising a right of residency. She would be during the time of the visa, but not afterwards. How is he any different than someone who's just overstaying their visa? Because the statute has a specific intent requirement. And that intent requirement does not just include a subjective prong, but also an objective prong. Here, he has absolutely... Is your physical presence in the United States exercising the right of residency? Your Honor, our position is that, according to the D.C. District Court in Lozada, Colón, that is sufficient under the statute to find that there is a lack of the requisite intent. Because, as I stated, the statute requires that the individual relinquish all rights of citizenship, and that would include physical presence in the United States. In Lozada, Colón... So physical presence in the United States is sufficient to show an exercise of the right of residency. That is correct, Your Honor. And importantly here, not only do we have physical presence, we have absolutely no cogent or credible or probable plan to actually ever exit the United States. The agency's decision is not arbitrary or capricious. It is entitled to Chevron deference... Where does that come from, the statute? That's what I want to know. Where do you get that requirement from, from the statute, an intent to give up a citizenship?  An intent. Intent to relinquish United States citizenship. Citizenship, yeah. Yes, Your Honor. Okay. The Supreme Court jurisprudence further develops that in Terraza, to speak about not just voluntariness, but also the intent to relinquish not just citizenship, but the privileges appertaining to citizenship, including the right to vote, the right to remain in the United States. Correct me, I thought he wanted to leave eventually, just doesn't have a plan yet. Isn't that right? Yes, Your Honor. Okay. So he does want to leave. He just doesn't have enough money for a ticket. He doesn't have any place to go yet, but he wants to leave, right? He doesn't want to stay in the United States. Your Honor, the agency does not challenge his subjective intent to want to relinquish and leave. However, he has no cogent plan, and that is significant. Well, that's my question about where does that come from. Okay, so here you have someone who you don't question his desire, his intention to give up his citizenship. You don't question his intention to leave. The agency says, well, yeah, but you don't have a plan to leave. And my question is where does that come from the statute? Because there's no Chevron deference here at all, right? We have to find this in the statute itself. Our position is that the statute is ambiguous and actually says— Even if it's ambiguous, you've got several different agencies that interpret this, and so we don't give Chevron deference under those circumstances. The government's position is that under Chevron Step 2, the agency's interpretation is entitled to deference. No, but we have case law. Doesn't the State Department also interpret this statute? That is correct, but in an entirely different context. Correct, but we have two statutes, two agencies who interpret a statute. We have very well-developed case law here that under those circumstances, there's no Chevron deference, right? The government's position is that's not accurate, Your Honor. Your Honor, our position is that under Bernhardt, as well as the decisions of this Court in Menkes and Mylar Laboratories, that the agency's decision is entitled to Chevron deference, and that is because it is well-reasoned. Were those cases where there was more than one agency interpreting the statute? I do not believe so, Your Honor. But those decisions also don't state that that would be a criteria by which the agency would not be entitled to Chevron deference. Here, Your Honor, our position is that Chevron deference is appropriate because what's involved is the expertise of the agency, political questions as to international relations, as well as Congress's ability to manage the uniform code of naturalization and denaturalization for United States citizens, as well as longstanding case law or, I'm sorry, application by the agency, which is not inconsistent with the application of other agencies, as you mentioned, the Department of State. Well, doesn't the State Department manual actually have a different view about this? It defines intent, the will to surrender citizenship. Your Honor, the Department of State is only adjudicating renunciation of citizenship occurring abroad, so their interests, the government interests that are at play, are manifestly different from what the Department of Homeland Security is facing. Here we have a United States citizen who would be renouncing within the United States, and there is a policy interest in not creating a population of post-citizen, stateless individuals who remain in the United States. Could you say what does happen? So suppose he's here, he renounces his citizenship, and he's stateless. What is his situation? He can't vote, right? He can't sit on juries. What would happen? Would he be detained? Your Honor, whether or not to— I'm just asking the question. I actually just don't know. Sure, Your Honor. Whether or not an individual is placed in removal proceedings is entirely within the discretion of the Attorney General. Again, it would create an administrative nightmare where this individual is now stateless, he has no connections or ties or approvals to enter any other country, and in the case of this particular applicant, he has a lengthy sexual abuse criminal history, which would require many countries not to allow him to be admitted. This doesn't happen a lot, does it? There could be a floodgate of individuals who simply want to renounce their United States citizenship and remain in the United States in a stateless situation. There are a lot of individuals who do not wish to recognize the United States as a government. The sovereign citizen movement immediately comes to mind, and USCIS sees a fair amount of those, Your Honor. So those people, if we were to rule against you and say that Mr. Kauffman could proceed and that did open the floodgates, those people, like Mr. Kauffman, could end up essentially in some sort of INS detention camps or something, or the rest of their lives. It would be administratively problematic, to say the very least. Put them in airports. Put them in Guantanamo. And we would caution that it is entirely unnecessary. Give them up their citizenship. We would caution that it's entirely unnecessary because USCIS is not preventing Mr. Kauffman from leaving the country. He is simply elected to travel to countries that won't accept him, and that is entirely within their sovereign right. Are there countries that would accept him? Countries that do not recognize the United States might accept him because they may not have a problem with his convictions. There are also countries that may have more lenient views on his sexual abuse history. The countries he has elected, the Western European countries he has elected to seek admission to, so as far as the record indicates, rejected his request. So from the government's, just from a policy point of view, the government, we're better off keeping him as a citizen. Is that right? Your Honor, our position is that Mr. Kauffman is free to leave the United States whenever he wishes, and he can always apply for renunciation within the United States, and he will be granted renunciation so long as he can meet the statutory requirements. And one of those requirements is that he actually intend to relinquish all of his rights, including the right to reside in the United States. And that's consistent with Lozano Colon, Your Honor. Let's suppose he, just trying to understand this, let's suppose he were able to somehow sneak across the border into Canada and then go to the U.S. Embassy and renounce his citizenship there. So he wouldn't be proceeding under A6 at that point. He would be proceeding under a different provision, and the State Department would be interpreting this. And under their interpretation, as Judge Tatel's earlier question indicates, they would say that he's exhibited a requisite intention, right? Yes, Your Honor. I mean, the issue of whether or not he actually intends to leave the United States would be established. He would be outside of the United States. And the State Department does not morally— Well, but the intention, that intention isn't in the statute. The intention that's in the statute is whether they intend to relinquish United States nationality, right? Yes, Your Honor. But the Supreme Court precedents in Rusk as well as Ephrem not just speak about relinquishing citizenship, but in actually relinquishing the rights and privileges appertaining thereto, including residency. So it's not enough to say, I don't want to be a U.S. citizen. You have to understand and be willing to surrender your right to both office, vote, reside in the United States. And Lozada Colon again— Hypothetically, let's imagine that he had contacted every single nationality throughout the world, every single one, asking to move there, and they had all denied him the ability to come. And he had all the evidence to show that he had tried to get— What would you do with that case? I recognize that's not this case, but help me understand what the law means from the government's perspective. Of course, Your Honor. Those are not the facts present here. Not by far. I said that twice. That's right, yeah. Not by far. But certainly, that statelessness is a consequence of renunciation is not a problem, and the Supreme Court has said that in a variety of cases. But here, it's not that statelessness is the consequence of renunciation that is the problem. The problem is he can't establish the statutory requirements so long as he has no plan to leave the United States. He has no means of leaving it. But in the language of statute, he has the intention of relinquishing U.S. nationality. And he's tried everything he can to leave the country. He's tried to get out of the United States. And yet the government's position is he has not shown an intention of relinquishing U.S. nationality because no one will let him go? Your Honor, the question about whether he has no means to leave the United States is not really the issue here. At the time he made his request, he was under an order of supervision by the state of Wisconsin. I'm talking about my hypothetical, not this case. My hypothetical is someone is attempting to renounce their citizenship and has tried every country in the world to move to, and none of them will let him in because of his past and his background. What does USCIS do in that case? Your Honor, again, if he could establish the objective, credible, cogent plan to leave the United States, he has a plan, he's tried it, and every nation of the world has denied it. Actually, as the other justice asked regarding whether the individual… It's a judge, not a justice yet. Someday, someday. He could always just leave the United States and request renunciation abroad. Now, I understand that might mean he would be illegally in another country. I see. But that's another way to accomplish his renunciation of citizenship. He would self-deport illegally for some other reason. Yes, Your Honor, and that's certainly something we see in many contexts, and the United States government is in no way preventing him from exercising that option. Does he have a passport? Your Honor, the record doesn't indicate that he has a passport, but it also doesn't indicate that there's any reason why he can't obtain one. He has a valid birth certificate from a state of the United States. So you're saying he could sneak into Mexico, for example. He could go wherever he wants, Your Honor, and request renunciation of citizenship abroad. But it doesn't sound like he'd have to sneak in. He could just get a passport and legally go to Canada, right? Or whatever country he desires, Your Honor. Now, whether or not that country will accept him is entirely within the sovereign prerogative of that foreign country. That's why I said sneak in. So your position is that he has to manifest his intent by physically going to another country, even if it's just on a tourist visa, and then renouncing before we'll really say that he has manifested his intent. That is one way in which it could be accomplished, but it's certainly not the only way. Even if he had presented a cogent plan, including here's my visa, or here's a relative I have in a foreign country, here are the funds that I have to travel, here's my work plan. I mean, whatever the agency in its discretion would look at and say here's a sufficient establishment of the intent requirement, and, of course, that determination is within the discretion of the agency. The appellate has the requirement to establish that. So could you go back to Judge Griffith's hypothetical? I just want to make sure. I'm not sure I heard your answer. Did you say that if he had tried every country in the world and everybody said no, that that would be enough of an intent for him to renounce his citizenship? No, Your Honor. I did not say that. I said that there would be other ways for him to potentially renounce his citizenship, such as leaving and entering another country. All right. I understand. Anything else? And he has to establish, as I said, the intent requirement by a preponderance of the evidence. Okay.  Thank you, Your Honor. Did Mr. Ward have any time left? Mr. Ward did not have any time. Okay. You can take two minutes. Your Honor, a few quick points. First of all, the government's argument is collapsing A5 and A6. A5 is the foreign renunciation provision. A6 is the domestic renunciation provision. As I mentioned before, A6 does not require a potential renunciate to ever leave this country and ever step foot on foreign soil. So it's no answer to say that because he might have access to A5, therefore he need not access A6. He's pressing his A6 claim as a fact. So, okay, I get your point that the government can't impose this per se rule, that they have to have an actual plan to leave the country. But under your theory, where the government is assessing his subjective intent, could it take account of that? In other words, could it look at all the factors and say, you know, here are all the factors. We don't think he has a subjective intent. And one of the things they account for is that he doesn't have a plan to leave. Could they even consider it? You see my point? The government should undertake a subjective inquiry, but that factor should not be part of the subjective inquiry, whether he has the present ability to leave. They can't even be part of it? Right, because under A6, he could intend to stay here forever and still intend to relinquish his U.S. nationality. And your Honor is correct that the inquiry should be subjective, and that's what, after Oyeam and Vance, the Supreme Court cases hold. And after Oyeam, the Supreme Court said that the touchstone of the analysis is the citizen's assent. In Vance, the court said that the touchstone of the analysis is the citizen's will. And those cases have erected an intent requirement that would effectuate and protect the citizen's free choice about whether to retain or relinquish U.S. nationality. So the agency is correct to undertake the searching inquiry into the applicant's state of mind, but where the agency went astray is in its letter when they designed this rule that has no place in the statute. Okay. Okay, thank you. Mr. Vore, the court appointed the Georgetown program as amicus, and as usual, we appreciate the program's assistance. The case is submitted.
judges: Tatel, Griffith, Wilkins